## De Luze *vs.* Bradbury.

The purchaser of land subject to a continuous and apparent easement, takes it subject to the burthen of that easement, and will be restrained from doing any acts which will interfere with the benefit and enjoyment of the easement to the full extent to which the party having a right thereto, who has not parted with or impaired the same, was entitled at the time such purchaser bought.

On final hearing on pleadings and proofs.

*Mr. T. N. McCarter*, for complainant.

*Mr. J. W. Taylor*, for defendant.

THE CHANCELLOR.

The bill in this action is filed by Alfred De Luze, a lunatic, by his guardian, to restrain the defendant, Adra E. Bradbury, from drawing off from a certain well situated on the land of the latter, any water, so as to interfere with, impair, or diminish the supply of water which, prior to, and at the time of, filing the bill, flowed therefrom to the house of the complainant. It prays a decree establishing the right of the complainant to have that water flow from the well referred to, through certain pipes and a tank or reservoir, all of which are also on the defendant's land, to the complainant's house, without diminution. The bill states that, on or about the first of May, 1862, Henry Nason and his wife leased to the complainant the premises now owned by him, situated in the township of Montclair, in the county of Essex, for the term of one year ; that the lease, which was by indenture, under seal, contained, among other things, the following covenants on the part of the lessors : " That, during the said term, there shall be a necessary supply of water in the said house, through the water pipes now laid therein, and that they, the said parties of the first part will indemnify the said

party of the second part against all damage to the said dwelling-house that may be caused by defects in, or by the bursting or leaking of the said water pipes during the said term, provided that, during the winter months, when said house is unoccupied, they be allowed access thereto. And that, in case the party of the second part, his heirs or assigns, shall elect to purchase the said premises for the sum of $5000, and shall on or before the first day of April, 1863, give written notice of such election to the said parties of the first part, their heirs or assigns, then the said parties of the first part, their heirs or assigns will, on the first day of May, one thousand eight hundred and sixty-three, upon receipt of the said purchase-money, by a good and sufficient deed, with full covenants, convey the said premises to the said party of the second part, his heirs or assigns, in fee simple, free from all encumbrances except a mortgage for three thousand two hundred and fifty dollars, to the trustees under the will of Nathaniel Crane, deceased, which mortgage shall be assumed by the purchaser, in part payment of the purchase money above mentioned, the said deed also to contain mutual covenants, that Hillside avenue shall be continued the same width as on the north side of Mountain road, and upon a continuation of the same course, half upon the premises above demised, and half on the adjoining lands of the parties of the first part." The bill further states, that prior to the execution of the lease, the negotiations therefor were conducted on the part of the complainant by his wife, and that, when she examined the house with a view to hiring it for occupation by the complainant's family, it was shown to her by Nason, who was then the owner of it, and she found it fitted up with a range, a boiler, and all the ordinary appliances for the use of hot and cold water, and with stationary wash trays and stationary wash bowls in all the bed rooms, with hot and cold water running into all of them, and apparently in good order, and that among other inducements held out by Nason to her, to induce her to consent to hire the house for and on behalf of the complainant, Nason assured her that the water with

which the house was supplied was pure mountain water from a never-failing spring; and the complainant alleges that the fact that the house was so supplied with hot and cold water, and with all the appliances for its convenient use, and that the house, which was new, was constructed for such supply of water, tended greatly to induce him and his wife to decide to make the contract for the house.

The bill further states, that afterwards, on or about the date of the lease above mentioned, the complainant and his family entered into the possession and occupation of the premises and of the house thereon, which was a large and commodious residence, and enjoyed them during the term of the lease, or until the conveyance of the property by Nason to the complainant, and during all that time, and up to the making of that deed, the complainant and his family enjoyed the use of a full supply of hot and cold water in and through the house by means of a boiler, wash-tubs, wash-bowls and other appliances erected in the house for the use of the water there, and that the water was then conducted to the house by means of an iron pipe leading from the house to a small tank or reservoir, which had been erected on other land of Nason and his wife, or one of them, and located on an elevation on the side of the road which runs by the house in a westerly or northwesterly direction, to the top of Mount Prospect, and sufficiently high to furnish head enough to force the water by its own pressure, to the upper rooms of the house; and the tank or reservoir was supplied by earthen or tile pipes, which led from it up the hill and on the side of the same road to the spring or well, from which the water ran through these pipes to the tank, and from there through iron pipes to the house; that the works were constructed by Nason, on his own land or land owned by him and his wife, at the time previous to the execution of the lease, when he and his wife or one of them, owned the premises leased to the complainant, as well as that on which the tank was erected and the pipes laid; that the works were constructed for the sole purpose of affording a lasting supply of water for the house, no other house

deriving any supply therefrom or having any connection with them; that on or about April 24th, 1863, Nason and his wife, in pursuance and fulfillment of the covenant in the lease, conveyed the property to the complainant in fee simple; that the complainant and his family have occupied the house and premises ever since, and that he is still seized of the premises; that on or about August 31st, 1864, Nason and his wife conveyed to William Graves, a tract of land adjoining that conveyed to the complainant, which tract so conveyed to Graves, was the one on which were located the tank or reservoir, and the well or spring and the pipes which conducted the water from the latter to the former; that all of these works were along the side of the highway and outside of the fence which separated the Graves' lot from the road; that in the summer or fall of 1865, the earthen pipes which conducted the water from the well or spring, to the tank, became obstructed by roots of trees, and otherwise insufficient, broken and defective, so that the complainant's supply of water at his house was diminished, and was in danger of being entirely cut off, as it was also, by the spring or well becoming filled with earth or sand washed into it from the surface, and the complainant, to insure a permanent supply of water to his house, in the fall of 1865, and while Graves continued to own the land conveyed to him by Nason and wife, with the full knowledge of Graves and without objection or remonstrance on his part, employed masons and laborers and took up the earthen pipes between the well and tank, and enlarged the tank and laid it in cement, laid down an iron pipe from the tank to the well and enlarged the well and dug it ten feet deep, and laid all the works in a permanent and substantial manner, so that from that time to the present, the complainant and his family have enjoyed, by means of these works, a full and abundant supply of water through their house at all times: that Graves afterwards, March 28th, 1867, conveyed to William B. Bradbury, part of the land conveyed to him by Nason and wife, including the premises on which the works were erected; that at the time of that conveyance, the tank

De Luze *v.* Bradbury.

and well were in plain sight, on the side of the road, and that Bradbury, when he took his conveyance, knew that they were on the land and were used for no other purpose than for supplying the complainant's house with water; that in the month of January, 1868, Bradbury died, and by his will devised the land so conveyed to him by Graves, to his wife, the defendant; that she has caused a deep trench to be dug on her land and through the fence which separates it from the highway, to the bottom of the well from which the water is now conducted to the tank, and is about to insert a pipe therein at a point below the level of the pipe which leads therefrom to the tank, to draw the water from the well upon her own land, where she has constructed a reservoir to receive it, the effect of which will be to divert entirely the water from the tank, and deprive the complainant's house of its whole supply of water.

The answer denies that the premises of the complainant at or before the time of the conveyance thereof to him by Nason and wife, were supplied with water from the spring or well now on the defendant's premises, and alleges that the defendant has been informed and believes it to be true, that the complainant's premises were then and until the conveyance from Nason and wife to Graves, supplied with water only from the spring or well on the north side of the road, on other premises than those owned by the defendant; and that when Nason and his wife conveyed to the complainant his premises, Nason proposed and offered to sell and convey to the complainant, also the right to the use of the water from that source, but the complainant refused to buy it and did not do so, but received a verbal license to use the water until Nason should want it, the complainant alleging as a reason for not purchasing or acquiring the right, that the supply was doubtful; that the complainant, finding a year or two afterwards, that the supply was very much diminished, abandoned the spring and the supply therefrom, and dug a well on his own premises from which he procured a supply of water, but being unable to force the water therefrom, to all parts of his

house, he obtained, as a matter of mere accommodation, a verbal license or permission from Graves to procure a supply from the spring or well on the defendant's premises, which were then owned by Graves, but the license or permission was only temporary and subject to revocation by Graves or his representatives at any time; that whatever expense was incurred by the complainant was voluntary and at his peril, and with the full, explicit understanding and knowledge, that the supply might be discontinued at any time; that he repeatedly endeavored to purchase from Graves, and afterwards from Bradbury, the defendant's husband, the right to draw water from the spring or well, but unsuccessfully, as Graves and Bradbury deemed the spring or well a very important and invaluable adjunct to the premises, and to be kept perpetually and without diminution of the supply, for the use of their premises, and invariably and peremptorily refused to sell or grant such rights for any period. The answer further alleges that the defendant is informed and believes it to be true, that her husband purchased the premises from Graves with the understanding and on the information as well from the complainant as from Graves and Nason, that the use, by the complainant, of the water from the well on the premises, was not a matter of right nor claimed as such, but was only temporary and by sufferance, and subject to be discontinued and cut off at any moment without notice or compensation. The defendant admits that she has taken the measures in the bill mentioned, to draw the water off from the well or spring for her own purposes, and she alleges that she has revoked the license to the complainant to use the water, and claims that she has a right to do so.

The only question submitted is as to the existence of the easement claimed in the bill of complaint. The evidence is very contradictory. On the one hand, Mrs. De Luze swears that the house, which was a new one, and had never been occupied, had, at the time of the execution of the lease, all the appliances for the use of hot and cold water mentioned in the bill; that Nason represented that the water was from

a never-failing spring, and came from the mountain, the pipes being laid on the south side of the road in Union street, and so into the cellar, and supplying the house; that there was no danger of the failure of the supply, and that the head of the spring was sufficient for a supply for another story in the house. She says she hesitated to take the house, because there was no other means of supplying water on the place— neither well nor cistern—but that the representations of Nason above mentioned, induced her to do so. She has resided there from the beginning of the term under the lease. She says that the complainant, during the term, bought the premises of Nason under the provision of the lease in that behalf; that the water was not, during the first year, as Nason had represented it; that the spring became muddy, and the water did not run freely in the house; that Nason, on being told of it, said it only required that the pipes be laid deeper, that they were only surface-laid, and promised to have the matter attended to, and to have the pipes laid deeper; that he had the lower ones laid deeper near the house, from the gate to the reservoir, which was located about midway between Mountain avenue and a road next west of it, sometimes called the Eagle Rock road, on higher ground than the ground on which the house stands; that the reservoir was supplied from a spring about one hundred and fifty to two hundred feet further up the hill; that the spring and reservoir were on the south side of Union street, and that the pipes, spring, and reservoir were all on the edge of the road, on the outside of the enclosure. She testifies that, after the complainant purchased the property, he built a new reservoir entirely, in the same place where the old one was; that he laid the pipes deeper, and stoned up the spring, the occasion of this being, that in the spring of the year the mud would wash in and make the supply in the house muddy, and that this work was done in 1863, 1864, and 1865, and was finished in the fall of the last mentioned year. It appears that in 1864 the complainant dug a well on his premises. The reason she gives for this is, that there was no other water on

the place, than the mountain water. She says that, though there was a connection between this well and the house, it was only temporary, and while the improvements above re- ferred to were being made to the reservoir. The complainant, after he bought the property, built a stable on it—(there was none on it when he purchased)—and built a cistern to supply it. Nason alleges that he constructed the reservoir, which appears to have been a tank of about seven feet square, for the purpose of supplying the masons with water for building the house; that it depended entirely for its supply on a spring on his land, on the north side of the road, the water from which was conducted to it by an underground pipe, still there. He says he agreed to keep the tank supplied with water during the term of the lease, even though he had to haul the water to it in carts. He states that during the term the surface water brought mud with it into the pipe, and he then dug a trench and laid tile pipe in it on the south side of the road running up the mountain, as the ground, being wet, indicated that there might be water there; that he found no spring, but laid the pipe from ten to fifteen, and perhaps twenty feet from the tank running up the mountain; that that pipe did not prove sufficient, and the pipe from the north side of the road was still continued in place. He says that just before the termination of the lease, the complainant determined to buy the property, and that he proposed to him to buy a water right, and make further improvements by way of development for water, but the complainant declined; that Nason told him he felt confident that a large supply of water could be obtained, and the complainant declined to have any- thing to do with it, because he had had so much trouble with mud; that the complainant then told him that he had decided to put down a well, and supply his house from it by means of a force pump, and that Nason thereupon told the com- plainant that he was welcome to take the tank and pipe without charge until he got his well fixed, Nason reserving the right to take up the pipe whenever he should want to use it. That, he says, was the condition of things when he

sold the property; that afterwards the complainant dug the well on his own premises, near his house; that he had to dig about thirty feet for water, and found he could not force it up from the well; that he (Nason) continued to let the complainant use the tank and pipe while he (Nason) owned the property; that the former came to him about the water every little while, complaining that it was so muddy it could not be used, and he still offered to sell the complainant a water-right on the north side, and to make further developments up the mountain, to see if they could not get water, but the complainant still refused, because the water was so bad after a rain; that, after Nason had sold to Graves, the complainant took up the tile pipe on the south side in repairing, and found it was broken, and that there was no water there, and afterwards came to Nason for advice as to what he should do about water, and asked whether he would not look after it, if the complainant should dig further up the mountain, in hopes of finding a spring with more water; that Nason told him that he thought he would find water if he would dig further up the mountain, and deeper, going deep enough to avoid surface water, and that he, Nason, told him if he would get Graves' permission, he would superintend the work for him with pleasure, without charge, the complainant being unable, on account of his business in New York, to attend to it; that afterwards the complainant came to him and told him he had got Graves' consent, and thereupon Nason proceeded to the work he had promised to superintend. He says they commenced digging from the terminus of the tile pipe on the south side of the road, and from thence up the mountain; that they must have dug over a hundred feet up the mountain above the terminus of the tile pipe; that they came into more water there; that they struck a vein among the rocks up there where there was more water; he thinks it must have been twelve feet under ground, and then the well was walled up and connected with the tank by an iron pipe furnished by the complainant, for whom and at whose expense all this work was done. This witness swears there was no well there, nor

any excavation, nor anything else which served the purpose of a reservoir to collect the water and discharge it through the tile pipe, till after Mr. Graves bought the property; that though before that time he did lay tile pipe up the mountain, on the south side, in the hope of finding water, he was stopped, he thinks, by a rock. He subsequently describes this in a somewhat different way. On his cross-examination he says the tile pipe laid by him on the south side of the road terminated among some stones, part of an old stone fence that had been along the road there and had been thrown into the gully on that side of the road. Mr. Graves testifies, that finding the workmen of the complainant engaged in repairing the tank, and making the improvements above referred to, he directed them to inform the complainant that he objected to it, and desired to see him on the subject; that this led to an interview between them, which appears to have resulted in Mr. Graves threatening to stop the complainant in the work if the latter should insist on any right on the south side of the street. He says that after considerable conversation the complainant said he did not want any trouble in relation to the matter; that he would like to get permission to go on with the improvements and finish them; that Graves told him he was at perfect liberty to go on and improve and use the water until he wanted to make other use of it. Graves says the complainant " wanted to buy it, at least he wanted a price put upon it," and that he, Graves, declined to dispose of it unless he disposed at the same time of the lot adjoining inside of it, between Graves' residence and the road. He says the complainant based his claim on the fact that the tank and pipes were in the highway, to which, he insisted, he had as much right as Graves. He further says that he, Graves, suggested that the complainant had no right to have the tank there, and the latter thought he had such right, because it existed when he bought his property. Graves adds that the complainant did not insist on any other right. He also says, in answer to the question whether the complainant claimed a right to draw from the south side, because of the tile having

been laid above the tank, "he claimed everything as it existed when he made the purchase." The witness adds that he, himself, did not know there was any tile there, and that that question was not raised at all. It appears from Graves' testimony that the complainant insisted on his right to the water from the north side of the road also, as part of his purchase from Nason.

The evidence of Nason seems to me to be open to the charge of disingenuousness in some respects. For instance, he seems unwilling to give a direct answer to the question whether he did not tell Mrs. De Luze, while the lease was a subject of negotiation, that the house had a full supply of mountain water from a never failing spring. His statement as to the tank is liable to the same criticism. He says it was a box, an old second-hand box which he put in for a tank. He admits, however, that it was in fact a second-hand box tank which had been used for water in a cottage he had bought. His statement that he provided for bringing the water to the house merely for the use of the masons in build-ing, does not seem to be entitled to credit in view of the pro-vision of the lease in respect to water, and the various conveniences he had put in the house, the use of which depended entirely on the supply from the tank, from which the water was conducted to the house, not by tile pipe, or any temporary conduit, but by an iron pipe, by which it was brought into the cellar. There is a discrepancy between his statement that he declined to superintend the work of re-pairing and improving the works until Graves' consent had been obtained, and the evidence of Graves, that he knew nothing of the work until after it had been commenced. Nason expressly swears that there was nothing at or beyond the end of the tile pipe to collect the water, that is, he denies, and that is the drift of all his testimony on that head, that there was any well or receptacle for the collection of water for the supply of the tank, in whole or in part, on the south side of the road, until one was made, as he supposed with Graves' consent, under his supervision

for the complainant, after Nason had sold to Graves. It is an important question in this cause, whether the fact is, on this point, as Nason swears, or whether it is as Mrs. De Luze testifies. It seems not difficult to determine which of these two witnesses is entitled to confidence in this particular, for Mr. Nason is not only not corroborated in his testimony on this subject by any witness, but is contradicted by several entirely disinterested persons. He sold to Graves on or about August 31st, 1864. James Hillary swears that he worked for the complainant, from about May, 1863, for over five years, as gardener, groom, &c.; that when he came there, the house was supplied with water from the same reservoir as at present; that the water was carried from the upper tank to the lower by earthen pipes; that the upper tank was a small, round thing, level with the road, that one would hardly notice whether there was a spring in it; that it was stoned up; that he assisted in rebuilding the tanks; that it was done in 1864, and finished in 1865, as near as he can recollect; that the first work he went at, was taking up the earthen pipe, from the lower tank to the upper one; that he took it out himself; that it connected the one with the other; that they then sank the drain about twelve feet deep at one end, and about four feet at the other, and then there was a two-inch iron pipe put down from the upper reservoir to the lower; that the upper reservoir was taken up, and built new and larger; that it was built of brick and stone, and that while this was being done, Mr. Graves owned the property, now owned by the defendant, on the south side of the street, and was present and saw the work going on, but made no objection to it to the witness' knowledge. James Bacron, who took the contract for painting the complainant's house when it was built, and worked at the job, testifies that there was, when he was so engaged, a small basin on the north side of the road, from which the tank was supplied; that he frequently heard Mr. Nason talk about that water supplying the house, and the witness doubted very much whether there was a sufficient supply from the tank for the house; that he heard

Mr. Nason frequently say there would be a sufficient supply of water; that the witness told him he thought there would be a better supply if he would bring the water from the other spring, from the premises now owned by the defendant; that Mr. Nason said he did not want to do that, because there was supply enough; that the witness then told him that if he would dig from the tank up to the corner of the road, (that is where the well in question is,) he thought he would find water enough, for that ground was always wet and muddy, at all seasons of the year; that Mr. Nason soon set to work to digging, and soon got a supply of water, but did not dig very deep; that he dug from the tank to the place where the well in question is, and then carried the water from the well to the tank; that there was considerable fall from the well to the tank then, and that this was in 1861. Michael Higgins, a stone mason, testifies that he worked at the improvement and repair of the water works, referred to by Nason as having been done under his supervision at the expense of the complainant; that they took up the old wooden tank and built a brick one, and stoned up the well; that there was a little well there before, and the pipes, (which he thinks were old, earthen pipes,) were laid from the well to the tank; that the complainant sunk the well deeper and stoned it up; that the well was near the bend of the road, on the same side as the tank; that he built the foundation of the complainant's house, and then the tank was supplied from a little basin on the north side of the road, afterwards from the well at the corner. He says he thinks this change was made before Graves' house was built. George Speer, the mason who had charge of the work, and who finished the complainant's house for Nason, testifies that when the complainant bought the house, it was supplied with water by a tank up the side of the hill; that the tank was supplied first when he worked at the house, by a tub on the other side of the street, and afterwards Nason built another tank further up the hill, which supplied the former. He identifies the place of the well as the location of the upper tank. Thomas De Witt

worked, also, on the repair and improvement of the water works. He says his work was opening the old line to receive the stream ; that the water got into the old, wooden tank, on the same line it does now ; that the water was conveyed to it in earthen tiles and stone, from the upper tank, on the same side of the road ; that he helped dig up the old tile pipe, and that it led from the new reservoir to the upper tank, right along side of the road. He says a man named Smith, rebuilt the upper tank, dug it deeper and stoned it up. These witnesses all testify to the fact that there was a well, reservoir, or tank, a receptacle to gather water for the supply of the lower tank, at the place where the well is at present, before the complainant made the repairs and improvements which Nason superintended for him. Bacron, Hillary, and Speer, all testify that it was there before Nason sold to Graves. Both Bacron and Speer testify that it was there as a means of supply to the tank, when the complainant bought the house. Bacron swears that Nason was concerned as to whether the source on the north side would be sufficient to supply the house, and on Bacron's suggestion, the additional supply from the well on the south side, was obtained. In this connection, it may be added that Mrs. De Luze swears that Nason told her, when she took the house, that the spring was located on the south side of the road. The complainant, being now a lunatic, is incapacitated from testifying. There was no one present at the conversation between him and Mr. Graves. The permanent character of the repairs and improvement done to the works by the complainant, does not indicate that he understood that he was exercising a privilege to be enjoyed merely by sufferance, and held only at the will of Mr. Graves and his representatives. I do not think the evidence is such as to warrant me in holding that the complainant is estopped by this conversation, or his acts immediately subsequent to it, from setting up the claim on which he now insists. A witness named Bigelow, testifies to a conversation between the complainant and Mr. Bradbury, in which the former urged the latter to sell him a spring. The testimony of this witness

is deprived of much of its weight and significance, by the fact that he then was, and still is, somewhat deaf, and besides, it seems quite apparent, that the spring to which the conversation had reference, was the one on Bradbury's land, of which Bacron spoke when he advised Nason to have recourse to it for a better supply for the complainant's house, then owned by Nason.

The weight of the evidence is, that the house was supplied with water from the lower tank, when the complainant bought, and also when he leased the premises ; that the tank was then fed by the spring on the north side of the road, and also by the well on the south side. Nason, when he sold to the complainant, owned the premises subsequently sold to Graves. When he sold to Graves, they were subject to the burthen of the easement claimed by the complainant in this suit, and are so still. The easement was continuous and apparent, and the defendant holds her land subject to it. The complainant is entitled to the relief he seeks. *Seymour* v. *Lewis*, 2 *Beas.* 439. The injunction, therefore, will be made perpetual. The complainant is entitled to costs.